IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 5, 2025 Session

FILED
10/21/2025
Clerk of the
Appellate Courts

# STATE OF TENNESSEE v. CLEOTHA ABSTON A/K/A CLEOTHA HENDERSON

**Appeal from the Criminal Court for Shelby County**
**No. 22-03719       Lee V. Coffee, Judge**

_____

### No. W2024-00928-CCA-R3-CD

_____

The Defendant, Cleotha Abston, appeals his Shelby County Criminal Court convictions of aggravated rape, aggravated kidnapping, and unlawful possession of a firearm by a convicted felon, for which he received an effective sentence of eighty years' incarceration. On appeal, the Defendant argues (1) the trial court erred by denying his motion to exclude reference to a firearm recovered from his vehicle following his arrest, (2) the trial court erred by denying his request to instruct the jury regarding lost or destroyed evidence pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), (3) the trial court erred by denying his motion to bifurcate his charge of unlawful possession of a firearm by a convicted felon, and (4) the evidence was insufficient to sustain his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and KYLE A. HIXSON, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Cleotha Abston.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Paul Hagerman and Brittany Neal, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

This case arises from the September 21, 2021 abduction and rape of the victim, A.F.[1] The Defendant was arrested on unrelated charges on September 3, 2022, and on September 8, 2022, a Shelby County Grand Jury returned a three-count indictment charging the Defendant with aggravated rape, especially aggravated kidnapping, and unlawful possession of a firearm by a convicted felon. Following pretrial motions, the Defendant's case proceeded to trial on April 8, 2024.

Federal Bureau of Investigation Special Agent Graham Hill testified he worked with the West Tennessee Violent Crimes Task Force to investigate the Defendant. During his investigation, Special Agent Hill and other members of the Task Force identified two vehicles associated with the Defendant: a white Dodge Charger and a "dark colored" GMC Terrain. Both vehicles were parked at the Lakes at Ridgeway apartment complex in Memphis on September 3, 2022, where members of the Task Force observed the Defendant exit an apartment unit and enter the GMC Terrain. The Defendant drove to the apartment complex's mailboxes, parked, and exited his vehicle. Special Agent Hill and other officers approached the Defendant and identified themselves as law enforcement; in response, the Defendant reentered his vehicle and "drove off at a high rate of speed."

A chase ensued as officers followed the Defendant away from the apartment complex, during which an officer crashed his vehicle into the Defendant's GMC Terrain to "disable" it. Afterwards, Special Agent Hill and other officers "took up a tactical position . . . and ordered [the Defendant] to surrender." The Defendant complied and was removed from his vehicle and arrested. Special Agent Hill testified that a firearm was recovered from the Defendant's vehicle following his arrest.

Memphis Police Department ("MPD") Officer William Watson testified he worked as a crime scene investigator. Officer Watson stated that on either September 4 or 5, 2022, he searched the Defendant's GMC Terrain and recovered a CZ 9-millimeter pistol from the driver's side floorboard.

The victim testified that several weeks prior to September 21, 2021, she ended a long-term relationship with her ex-boyfriend and created a profile on the Plenty of Fish online dating website. She stated that shortly after she created her profile, she received a message from a man named "C.J.," whom she later identified as the Defendant. The victim and the Defendant exchanged several messages over the course of twenty to thirty minutes. At the conclusion of their conversation, the victim decided she was not yet ready to begin dating again and deactivated her Plenty of Fish account.

_____

[1] It is the policy of this court to refer to victims of sexual crimes by their initials.

Approximately one week before September 21, 2021, the victim reactivated her Plenty of Fish account and saw that the Defendant had sent her another message. Deciding to "g[i]ve him a chance," the victim responded to the Defendant's message, and the two eventually exchanged cell phone numbers. The victim described the text messages she and the Defendant sent one another as "flirtatious." During their conversations, the Defendant informed the victim that he worked in maintenance for the Lakes at Ridgeway apartment complex. The victim testified that she and the Defendant discussed his paying her in exchange for sex. She also testified that they discussed going on a date to Olive Garden and then returning to the Defendant's apartment to "chill."

The victim and the Defendant scheduled their date for September 21, 2021. The victim recalled that she was supposed to meet the Defendant at his apartment, wait for him to "freshen up," and then drive them to their date. The Defendant provided the victim with an address for a unit at the Lakes at Ridgeway apartment complex, and the victim drove to meet him there. The victim recalled that she got lost on her way to meet the Defendant because it was raining and her GPS did not direct her to the correct apartment unit. When she finally arrived, she found the Defendant standing in the doorway of an apartment unit. The victim exited her car and walked towards the Defendant, shielding her face from the rain with her hands. The door to the apartment unit was open behind the Defendant, and the victim briefly saw inside it. She noted that it appeared to be under renovation: the apartment was unfurnished, and the walls and flooring were unfinished. She also saw a sliding glass door at the opposite end of the apartment, which led outside.

The victim testified that when she arrived at the doorway to the vacant apartment unit, the Defendant withdrew a firearm, pointed it at her neck, and said, "[B]****, if you move, I'm gonna kill you." The victim recalled she was so frightened that she urinated on herself. The Defendant then placed a shirt over the victim's head and instructed her not to look at him. Pressing his firearm against the victim's back, the Defendant directed her inside the apartment. Once inside, the Defendant "snatched [the victim's] purse out of [her] hand" and threw her cell phone across the floor. The Defendant then led the victim through the apartment to the sliding glass door. The victim heard the door slide open, and the Defendant then directed her outside. She stated she saw a white Dodge Charger parked outside, which she remembered seeing while driving through the apartment complex in search of the correct unit. The Defendant directed the victim towards the Charger, opened the vehicle's back door, and instructed her to get inside the vehicle and lie down on her stomach. The victim recalled that the Defendant again instructed her not to look at him and threatened to kill her if she did so.

The victim testified that the Defendant removed her leggings when she entered the vehicle and that she began "begging him not to do what he was fixing to do." She also told the Defendant that she was pregnant. The Defendant responded that the victim was lying

and that he would "take [her] somewhere after he got done raping" her. After removing the victim's leggings, the Defendant attempted to insert his penis into her anus and attempted to perform oral sex on her. The Defendant then vaginally raped the victim. The victim stated that she screamed, cried, and begged the Defendant to stop throughout the rape and that the Defendant responded by telling her to "be quiet" and informing her that he was "going to do what he want[ed] to do" with her.

The victim was unsure of how long the Defendant raped her, but she averred that it "seemed like forever." She was unsure whether he ejaculated, but she stated that after the Defendant ultimately "finishe[d]," she asked him whether he was going to kill her. The Defendant responded that he was not sure and asked if he should. The victim begged the Defendant not to hurt her, telling him that she was "a mom now" and that she "just want[ed] to be able to go home alive to [her] family." The victim recalled that the Defendant taunted her about the risks of meeting strangers online. The victim assured the Defendant that she would not "go to the police" or "say anything," and the Defendant eventually exited the vehicle and instructed her to do the same. The victim attempted to exit the vehicle, but the Defendant pushed her back inside when a truck drove past. When the victim finally exited the vehicle, the Defendant again placed a shirt over her head and instructed her not to look at him.

The Defendant directed the victim back inside the vacant apartment unit at gunpoint. Instructing her to keep her back towards him, the Defendant removed the shirt from the victim's head, returned her leggings to her, and told her to get dressed. The victim did so, and the Defendant then directed her to another corner of the apartment. The Defendant instructed the victim to sit in the corner and to leave the apartment only after she "hear[d] the engine rev." The Defendant threatened to kill the victim if she left any earlier and warned her that he knew where she lived.

The victim waited until she heard the Defendant drive away, then collected her purse and cell phone and ran to her car, leaving the door to the vacant apartment unit open behind her in her haste to escape. Once inside her car, the victim called her friend, University of Tennessee Police Department ("UTPD") Officer Kiera Hardville, and told her that she had been raped and "held against [her] will." Officer Hardville told the victim to meet her at Regional One Medical Center, near where Officer Hardville typically patrolled, and the victim did so. The victim recalled that Officer Hardville waited with her until "the other police arrived."

The victim testified that she spoke with MPD Officer Jermaine Jamison at Regional One Medical Center and told him that she had met the Defendant online and that the Defendant had raped her at gunpoint. She also recalled going to Regional One Medical Center's sexual assault center and being examined by a nurse and telling her of her rape.

- 4 -

The victim further testified that she was interviewed by MPD Sergeant Shemeka Love.[2]  The victim stated she told Sergeant Love she met the Defendant on Plenty of Fish and that she and the Defendant had agreed to meet in person on September 21, 2021.  She also recalled telling Sergeant Love that she and the Defendant had discussed the Defendant's paying the victim in exchange for sex.  The victim recounted her rape at gunpoint to Sergeant Love, gave Sergeant Love her cell phone, told Sergeant Love where the rape occurred, and offered to lead Sergeant Love to the vacant apartment unit.  The victim recalled that Sergeant Love initially stated she would visit the vacant apartment unit within the next few days, but the victim insisted upon returning that night because she was concerned the Defendant would return and attempt to retrieve evidence, such as the shirt he had used to cover her head.  Ultimately, Sergeant Love relented, and the victim accompanied her and several other officers to the vacant apartment unit.

The victim recalled that she and the investigating officers arrived at the apartment complex to find the door to the vacant apartment unit "wide open."  The victim walked with the officers through the apartment and recounted the Defendant's guiding her towards the sliding glass door at gunpoint.  She also took the officers through the sliding glass door to the small street outside the apartment unit where the white Dodge Charger had been parked.  The victim testified she repeatedly told the officers she "wanted to prosecute" her rape and kidnapping, but that "this thing lingered and lingered."

The victim identified the white Dodge Charger from photographs taken after the Defendant's arrest on September 3, 2022.  She was also presented with a photograph of the CZ 9-millimeter pistol recovered from the Defendant's GMC Terrain following his arrest.  The victim testified that this firearm resembled the firearm the Defendant had used on September 21, 2021.  The victim recalled that the firearm the Defendant used was "black" and "kind of silver."

The victim estimated that she was between five and six months pregnant at the time of her rape and kidnapping.  She also conceded that she had a pending criminal charge of aggravated assault at the time of the Defendant's trial.

On cross-examination, the victim clarified that she originally joined Plenty of Fish in mid-2019 and that she had met her previous boyfriend of three years on the website.  She stated she deleted her profile during their relationship and reactivated it when the relationship concluded in April of 2021.  She described the nature of her previous

---

[2] Sergeant Love had been promoted to the rank of Lieutenant by the time of the Defendant's trial. For consistency, we will refer to her by the rank she held during the events giving rise to the Defendant's charges.  We intend no disrespect.

relationship as "on and off." She also testified that she primarily used her Plenty of Fish profile to seek "short-term relationships." However, she maintained that the Defendant was the only person she had met in person from Plenty of Fish since ending her relationship with her previous boyfriend.

The victim described her conversations with the Defendant as "dry" but noted that the Defendant was insistent upon meeting her. She testified she informed the Defendant that her "time was not free" at some point during their conversations, although she averred that their conversations were not entirely focused on sex. She stated that she did not discuss how much money the Defendant was to pay her for sex before she met him because Plenty of Fish did not permit its users "to communicate about money" in their messages; further, although she conceded she expected to earn $200 from the Defendant, they "didn't even make it to th[e] point of discussing a price" when they met in person because the Defendant "pulled a gun on [her]."

The victim testified that she suffered complications during her pregnancy, which made it difficult for her to maintain employment. She averred that these complications led her to discuss exchanging money for sex, which she testified she did not otherwise typically do. She agreed that she did not want the police to review her cell phone as evidence because she did not want them to see the text messages she had sent the Defendant discussing her exchanging money for sex.

The victim further testified that the Defendant held her at gunpoint throughout the rape. She agreed that she stated during her interviews with the police that her rape had lasted between thirty and forty minutes and that the Defendant "had vaginal sex with [her] three times." She also noted that the Defendant repeatedly threatened to kill her. She was unsure whether she told Sergeant Love during her interview that she urinated on herself, but averred she must have mentioned it to one of the police officers she spoke with because she was provided a change of pants at some point.

Gwendolyn Brown testified that by September 21, 2021, she and the Defendant had been dating for eighteen months and had been living together in an apartment unit at the Lakes at Ridgeway apartment complex, along with Ms. Brown's children. Ms. Brown stated that she owned two vehicles, a black GMC Terrain and a white Dodge Charger, the latter of which the Defendant typically drove. Ms. Brown recalled that on the morning of September 21, 2021, she and the Defendant had an argument regarding how they would get Ms. Brown's children to school. Ms. Brown testified that the Defendant typically took the children to school but was unable to do so that day because he stated he needed to work. Ms. Brown stated that she was at work on the evening of September 21, 2021, but her children were at home. She described the walls separating the units in her apartment

building as thin and stated that her children did not report hearing or seeing anything unusual that evening.

Ms. Brown stated she received a phone call several days after September 21, 2021, from her apartment complex manager, who informed her that a crime had been committed in one of the units in her apartment building. The manager provided Ms. Brown with a summary of the crime, noting that "[s]omeone met somebody on a dating website." Ms. Brown recalled that the manager asked her if she owned a Dodge Charger, but then "cut it off" and advised her to "check the news" if she wanted more information about the crime. Ms. Brown recalled that when she informed the Defendant of her conversation with the manager the next day, the Defendant "just nodded his head."

Ms. Brown testified that she also received a phone call from Sergeant Love several days after September 21, 2021. Sergeant Love asked Ms. Brown whether she had a boyfriend, and Ms. Brown provided her with the Defendant's name and date of birth, as well as a general description of his appearance. Sergeant Love asked Ms. Brown if she could visit her at her apartment to discuss the matter further, and Ms. Brown agreed. Ms. Brown then informed the Defendant of her conversation with Sergeant Love, and the Defendant cautioned Ms. Brown against "trust[ing] the cops." Ms. Brown maintained that she still wished to speak with Sergeant Love because she wanted to "find out what went on inside [her] vehicle."

Ms. Brown recalled that she was pregnant at the time of the offenses and that she gave birth to her youngest child on September 26, 2021. She stated that the Defendant was the father of this child and that he went with her to the hospital when she gave birth. Ms. Brown and the Defendant remained at the hospital for several days after Ms. Brown gave birth. When the couple returned home, the Defendant asked Ms. Brown if she would switch vehicles with him. Ms. Brown recalled that she found this odd because the Defendant typically preferred to drive the Dodge Charger, and the GMC Terrain had an oil leak. She nevertheless agreed to switch vehicles, and shortly thereafter, the Defendant "disappeared," taking the GMC Terrain with him. Ms. Brown stated that the Defendant would occasionally "disappear" whenever the couple "ha[d] a problem" and would stay at his brother's home for a few days. She stated the Defendant was away for two weeks during this absence. She also noted that these absences were typically precipitated by a disagreement, but that she and the Defendant were not arguing after she gave birth; to the contrary, she stated she had assumed the Defendant would "spend time" with her and her children after she gave birth and that she had to "do everything" on her own in his absence.

Ms. Brown testified that Sergeant Love and several other officers visited her apartment unit on October 5, 2021, during the Defendant's absence. Sergeant Love

presented Ms. Brown with a series of photographs of different individuals, from which Ms. Brown identified the Defendant. Ms. Brown offered to allow Sergeant Love to inspect the Dodge Charger, but Sergeant Love declined to do so. She estimated the officers remained at her apartment for two hours. Ms. Brown further testified that when the Defendant finally returned home, he had cut his hair.

Ms. Brown recalled that after the offenses, she began discussing with the Defendant her desire to move into a vacant apartment unit adjacent to the unit in which she and the Defendant lived. She noted that the vacant unit was more desirable because it had an additional bedroom. Ms. Brown testified that she and her children took multiple tours of the vacant apartment unit and that the Defendant refused to accompany them.

UTPD Officer Kiera Hardville testified that she first met the victim via an online women's "empowerment group." She estimated she and the victim had met up for lunch once or twice and stated they did not talk often. Officer Hardville recalled that on the night of September 21, 2021, she received a phone call from the victim who, through tears, informed her that she had been raped and held against her will. Officer Hardville told the victim to meet her at Regional One Medical Center, which was near where Officer Hardville typically worked. Because the incident had occurred outside the UTPD's jurisdiction, Officer Hardville also advised that the victim call 911. Officer Hardville estimated that the victim arrived fifteen minutes after their phone call. She recalled that the victim's hair "was kind of all over," her clothes were dirty, and she was "still crying and frantic." The victim assured Officer Hardville upon her arrival that she had called 911 and that officers from the MPD were en route.

MPD Officer Jermaine Jamison testified he was assigned to work as a patrol officer at Regional One Medical Center on September 21, 2021. Officer Jamison recalled that he met with the victim and interviewed her when she arrived at the hospital. The victim informed Officer Jamison that she had "met a guy on a dating site" and agreed to meet him "at some apartments." The victim went to the address the Defendant provided her with and found him standing in the doorway of an apartment unit. The victim exited her car and approached the Defendant, noticing that the apartment appeared "abandoned." The Defendant then pressed his firearm to her head, took her belongings from her, and things "went south." The victim provided Officer Jamison with the address that the Defendant had given her. Officer Jamison completed a report of his interview and submitted it to his supervisor for further investigation.

On cross-examination, Officer Jamison recalled that he interviewed the victim at approximately 8:45 p.m. and that the victim stated she arrived at the apartment complex around 7:00 p.m. Officer Jamison recalled that the victim had no "visible injuries" during

their interview. He did not recall whether the victim discussed specific text messages between herself and the Defendant.

Sergeant Shemeka Love testified she worked with the MPD's Sex Crimes Bureau at the time of the offenses and investigated the victim's report that she had been raped and kidnapped. Sergeant Love recalled that she met the victim at Regional One Medical Center and escorted her to the hospital's Rape Crisis Center. Sergeant Love testified that she interviewed the victim following the victim's interview with Officer Jamison and her treatment by a nurse practitioner.

Sergeant Love recalled that the victim informed her she had met the Defendant, who she knew only as "C.J.," approximately one week prior to the offenses via Plenty of Fish. The victim stated that she exchanged text messages with the Defendant during this time and eventually arranged to meet him on the evening of September 21, 2021. The victim reported that when she met the Defendant, she found him standing in the doorway of an apartment unit. Shortly after the victim entered the apartment and noticed it was vacant, the Defendant placed a shirt over her head, "placed a black handgun to her neck and head area," and directed her outside the apartment and into a vehicle. Sergeant Love recalled that the victim identified the vehicle as a white Dodge Charger. She recalled that the victim reported the Defendant had attempted to penetrate her anus with his penis, performed oral sex on her, and vaginally raped her inside the vehicle.

During their interview, the victim informed Sergeant Love that some of the text messages she had sent the Defendant were "sexual in nature." Sergeant Love recalled that the victim showed her some of these text messages, one of which included a photograph of the victim "sucking on either a lollypop or . . . [a] popsicle in a very provocative manner" with her breast exposed. The victim also disclosed that she and the Defendant discussed the Defendant's paying the victim for sex. Sergeant Love testified that the victim "insist[ed] on going back" to the vacant apartment "that night" during her interview.

Portions of the victim's video-recorded interview, taken from Sergeant Love's body camera, were played for the jury. In one video, Sergeant Love asked the victim to provide an emergency contact number in case she did not have her cell phone, and the victim protested that she needed her cell phone, as it was her "business phone." Sergeant Love stated she could return the victim's cell phone to her, but that the MPD would be unable to collect any evidence from the cell phone if she did so. The victim maintained that she did not want the MPD to "process" her cell phone, noting that the Defendant's fingerprints would be equally available as evidence at the vacant apartment unit. Sergeant Love stated she told the victim she would return her cell phone to her.

Sergeant Love testified that she and other officers traveled with the victim to the vacant apartment unit following the victim's interview. A video of Sergeant Love's visit to the vacant apartment unit, taken from her body camera, was also played for the jury. The video depicted Sergeant Love, the victim, and other officers walking towards the vacant apartment unit. An unidentified officer walked slightly in front of Sergeant Love and entered the vacant apartment unit. The apartment was unfurnished, and its floors were unfinished. Light from a nearby streetlight shone into the apartment through a set of windows at the back, near where a set of white blinds obscured a large sliding glass door. Sergeant Love exited the apartment through the sliding glass door and entered a small backyard. A narrow street sat beyond the backyard, illuminated by the nearby streetlight. Sergeant Love and another officer briefly looked around the backyard and street before reentering the apartment to speak with the victim about her allegations. The officers informed the victim they had not recovered any evidence, and the group eventually left the apartment together. Outside, the victim gestured towards where she had parked her vehicle and noted she had also seen a UPS truck parked nearby when she arrived.

Sergeant Love testified that she returned to the apartment complex "maybe a couple of weeks later" and found a white Dodge Charger parked near the vacant apartment unit. Sergeant Love checked the vehicle's license plate and discovered the vehicle was registered to Ms. Brown. Sergeant Love subsequently called and met with Ms. Brown, who informed her that the Defendant "had access to the vehicle." Sergeant Love averred that she "decided not to tow" the white Dodge Charger following her interview with Ms. Brown because approximately two weeks had passed since the victim first reported her rape and because Ms. Brown had noted that she had also driven the vehicle during that time.

Sergeant Love further testified that both the victim and Ms. Brown gave her the Defendant's cell phone number. Sergeant Love stated she attempted to call the Defendant several times during her investigation and that eventually, a man answered the phone. When Sergeant Love asked him "if he would come in and speak with [her]" regarding an ongoing investigation, the man responded, "You don't have anything on me," and ended the call.

On cross-examination, Sergeant Love testified that she was concerned that MPD would not be able to collect the Defendant's fingerprints from the victim's cell phone if the victim wanted her cell phone back. She noted, however, that the victim had also touched her phone since the Defendant had taken it from her, so the Defendant's fingerprints may not have been preserved on the phone. She also stated that the victim was not required to surrender her cell phone as evidence and that she was unsure whether there was any other relevant evidence contained on the cell phone. She conceded she reviewed some of the messages and photographs between the victim and the Defendant on the

victim's cell phone. She agreed she "could have taken some photographs of the messages that were on [the victim's] phone," but averred she did not do so because the victim "was very upfront," "honest," "open," and "wasn't trying to hide anything." Sergeant Love also stated she did not want to "re-victimize" the victim and wished to protect her privacy.

The Defendant also introduced portions of the victim's video-recorded interview taken from Sergeant Love's body camera during her cross-examination. In one video, the victim stated she and the Defendant had previously discussed having sex, but that the date they had scheduled for September 21, 2021, was not "supposed to be about that." In another video, the victim told Sergeant Love she had used a fake cell phone number to send text messages to the Defendant. Sergeant Love asked to review the messages between the victim and the Defendant, and the victim consented, handing her cell phone to Sergeant Love. While reviewing the messages, Sergeant Love held the victim's cell phone at an angle towards her body camera. She testified she was not sure where her body camera was positioned during the interview, but that it was her "intent for [the messages] to get on camera." She also testified that she did not recall the specific contents of the text messages exchanged between the victim and the Defendant, though she noted they included photographs.

On redirect examination, Sergeant Love agreed that the victim stated during her interview that she had previously discussed the Defendant's paying her for sex, but that the victim did not consent to having sex with the Defendant on September 21, 2021. She also noted that she first attempted to contact the Defendant on October 5, 2021, the same day she interviewed Ms. Brown. She unsuccessfully attempted to contact the Defendant again on October 28 and November 4, 2021.

Diary Prater, a retired forensic nurse practitioner previously employed at Regional One Medical Center's Rape Crisis Center, testified as an expert in the fields of sexual assault examinations and women's health. Nurse Prater testified that she treated the victim on the evening of September 21, 2021, and she recalled that the victim reported having been vaginally raped by a man she had met approximately one week previously via a dating website. Nurse Prater reported that the victim was unsure whether her rapist had ejaculated. She also noted that the victim was cooperative, quiet, and tearful, and that she had no visible injuries. Nurse Prater testified she collected buccal and vaginal swabs from the victim, which she included in a rape kit.

Tennessee Bureau of Investigation Special Agent Christie Smith testified as an expert in forensic biology. She testified that she examined the swabs included in the victim's rape kit. Special Agent Smith's examination of the victim's vaginal swab detected non-sperm cells consistent with the victim's DNA and sperm cells consistent with the

- 11 -

Defendant's DNA.[3]  She testified that the probability of randomly selecting an unrelated individual from the sample as a contributor was one in a number greater than the world's current population.

Following Special Agent Smith's testimony, the parties stipulated that the Defendant had previously been convicted of a prior violent felony.  The trial court issued a contemporaneous instruction to the jury to consider the Defendant's prior conviction only for the purposes of evaluating his guilt or innocence for his charge of unlawful possession of a firearm by a convicted felon.

The State rested.  Following a *Momon* colloquy, the Defendant elected not to testify and did not present additional proof.  Upon this evidence, the jury convicted the Defendant of aggravated rape, aggravated kidnapping as the lesser-included offense of especially aggravated kidnapping, and unlawful possession of a firearm by a convicted felon.  The Defendant waived a formal sentencing hearing and agreed to receive the maximum sentences for each of his convictions, which were to be served consecutively.  Accordingly, the trial court imposed an effective sentence of eighty years' incarceration.  The Defendant filed a timely but unsuccessful motion for new trial, and this timely appeal followed.

## II.  ANALYSIS

On appeal, the Defendant argues (1) the trial court erred by denying his motion to exclude reference to a firearm recovered from his vehicle following his arrest, (2) the trial court erred by denying his request to instruct the jury regarding lost or destroyed evidence pursuant to *State v. Ferguson*, (3) the trial court erred by denying his motion to bifurcate his charge of unlawful possession of a firearm by a convicted felon, and (4) the evidence was insufficient to sustain his convictions.  We will address these issues in turn.

### A.  ADMISSION OF THE FIREARM

First, the Defendant argues the trial court erred by denying his motion to exclude reference to a firearm recovered from his vehicle following his September 3, 2022 arrest. The Defendant asserts the firearm was irrelevant to his prosecution in this case because it was recovered following his arrest for unrelated charges involving a different victim nearly one year after the offenses giving rise to his charges in this case, and because the victim in this case was unable to specifically describe the firearm.  He also argues the firearm was inadmissible pursuant to Tennessee Rule of Evidence 404(b) because the State's primary purpose in introducing it was to show the Defendant's propensity for violence.  The State

---

[3] The parties stipulated that after the Defendant was arrested, DNA samples were taken from the Defendant and were transferred to the Tennessee Bureau of Investigation for analysis.

responds that the firearm was relevant and admissible because it tended to corroborate the victim's testimony that the Defendant threatened her with a firearm and held her at gunpoint during his commission of the offenses. We agree with the State.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not relevant is inadmissible, and "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee," the Tennessee Rules of Evidence, or "other rules or laws of general application in the courts of Tennessee." Tenn. R. Evid. 402. Further, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," even if it is otherwise relevant. Tenn. R. Evid. 403.

Generally, a trial court's ruling on the admission of evidence based upon relevance will not be reversed unless the trial court abused its discretion. *See State v. Gomez*, 367 S.W.3d 237, 243 (Tenn. 2012); *State v. DuBose*, 953 S.W.2d 649, 652-53 (Tenn. 1997); *see also State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006). Under that standard of review, we will reverse the trial court's decision "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning," and the admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (internal quotation marks omitted) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Pursuant to Tennessee Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Such evidence may be admissible, however, "where it is probative of material issues other than conduct conforming with a character trait," such as motive, intent, identity, absence of mistake, or common scheme or plan. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005) (appendix); *see also* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. "Rule 404(b) seeks to prevent convictions based on mere propensity evidence," while still allowing for the admission of relevant evidence. *State v. Rimmer*, 623 S.W.3d 235, 261 (Tenn. 2021). Rule 404(b) thus includes the following strict procedural requirements as prerequisites for admission:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

- 13 -

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "Although appellate courts have repeatedly emphasized a restrictive approach to Rule 404(b), the decision of a trial court to admit or exclude evidence will not be overturned on appeal absent an abuse of discretion, provided that the court adhered to the Rule's procedure." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (citing *State v. Kiser*, 284 S.W.3d 227, 288 (Tenn. 2009)). However, when the trial court fails to substantially comply with Rule 404(b)'s procedural requirements, we review its ruling *de novo*. *DuBose*, 953 S.W.2d at 652.

The Defendant filed a pretrial motion pursuant to Tennessee Rules of Evidence 401, 403, and 404(b) to exclude reference to the firearm recovered from his vehicle following his arrest. The Defendant argued the firearm was not relevant to any material issue at trial because the victim had failed to identify the firearm recovered from the Defendant's vehicle as the same firearm the Defendant used during the perpetration of the victim's rape and kidnapping. He also asserted the victim's description of the firearm the Defendant used was "extremely vague."

The trial court heard the Defendant's motion on March 27, 2024. At the hearing, the State argued the firearm was admissible because of the similarities between the victim's allegations and the circumstances of the Defendant's arrest. Specifically, the State noted that the firearm "matche[d] the description that [the victim] gave the day she was raped" and that the Defendant was "arrested in the same apartment complex in the proximity of the same vehicle used in the rape." The Defendant responded that the victim's description of the firearm was general and that there was no proof that the firearm recovered from the Defendant's vehicle following his arrest was the same firearm he used during the perpetration of the victim's rape and kidnapping. He also noted the firearm was recovered nearly a year after the offenses giving rise to his charges in this case. The Defendant further asserted that the victim's credibility would be a central issue in this case and that admitting the firearm would allow the State to "bolster their case." The State responded that the Defendant's arguments primarily dealt with the weight of the evidence rather than the admissibility of the firearm.

Following arguments, the trial court denied the Defendant's motion to exclude reference to the firearm and held that the firearm was admissible for demonstrative purposes. The trial court reasoned that the firearm was probative of a material issue

- 14 -

because each of the Defendant's charged offenses required proof that the Defendant used a firearm, and the victim would testify that the firearm resembled the firearm the Defendant used during the perpetration of her rape and kidnapping. The trial court further concluded, in light of the State's need to establish the Defendant's use of a firearm as an essential element of the charges, that any danger of undue prejudice inherent in the admission of the firearm did not substantially outweigh the firearm's probative value.

At trial, Special Agent Hill testified that a firearm was recovered from the Defendant's vehicle following his arrest, and Officer Watson testified that he recovered a CZ 9-millimeter pistol from the driver's side floorboard of the Defendant's vehicle. The victim was presented with a photograph of this firearm, and she testified that it resembled the firearm the Defendant used during the perpetration of her rape and kidnapping on September 21, 2021. The victim further recalled that the firearm the Defendant used was "black" and "kind of silver."

We first address the Defendant's arguments against the firearm's relevance. The Defendant maintains on appeal that the firearm was irrelevant because it was recovered nearly one year after the offenses giving rise to his charges in this case, and because it was recovered following his arrest for unrelated charges. He also asserts that the victim's description of the firearm used during the perpetration of her rape and kidnapping was generic and "described a significant percentage of handguns that exist." The Defendant thus appears to contend that the State was required to establish that the firearm recovered from the Defendant's vehicle following his arrest was the same firearm used against the victim.

As the trial court reasoned, each of the charged offenses in this case required the State to prove that the Defendant used or possessed a firearm, weapon, or article that led the victim to reasonably believe it was a weapon.[4] In that respect, the victim's testimony that the firearm recovered from the Defendant's vehicle following his arrest resembled the item he used in the perpetration of the offenses giving rise to his charges in this case was highly relevant. Furthermore, although identity was not an issue in this case, the State's introduction of the firearm tended to show that the Defendant had access to a firearm, which matched the victim's general description of the firearm used against her during the offenses. The fact that the firearm was recovered nearly a year after the offenses was of little consequence to its relevance; as the trial court reasoned, consideration of the timing

---

[4] Count 1, aggravated rape, requires that the attacker be armed with a weapon or any article used or fashioned to lead the victim to reasonably believe it to be a weapon. Tenn. Code Ann. 39-13-502(a)(1). Count 2, especially aggravated kidnapping, requires that the kidnapping be accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. Tenn. Code Ann. 39-13-305(a)(1). Count 3, unlawful possession of a weapon, requires that a defendant possess a firearm. Tenn. Code Ann. 39-17-1307(b)(1).

of the firearm's discovery concerns the weight of the evidence rather than its admissibility. *State v. Jones*, No. M2023-00799-CCA-R3-CD, 2024 WL 4442058, at *13 (Tenn. Crim. App. Oct. 8, 2024) (concluding, in a dispute as to the admissibility of a photograph of the defendant holding a firearm, that the issues of (1) the length of time between the crime and the depiction of the defendant's possession of the firearm and (2) whether the State was able to "establish a definitive link" between the firearm depicted in the photograph and the firearm used in the commission of the crime were issues of evidentiary weight rather than evidentiary admissibility), *perm. app. denied* (Tenn. Mar. 12, 2025). Similarly, the fact that the victim described the firearm in generic terms does not render the firearm inadmissible. *Id.* (first citing *State v. Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *56 (Tenn. Crim. App. Apr. 8, 2019), *perm. app. denied* (Tenn. Aug. 15, 2019); then citing *State v. Bailey*, No. M2018-00018-CCA-R3-CD, 2019 WL 2453278, at *4 (Tenn. Crim. App. June 12, 2019), *perm. app. denied* (Tenn. Oct. 11, 2019); and then citing *State v. Robinson*, No. M2016-02335-CCA-R3-CD, 2017 WL 4693999, at *6-8 (Tenn. Crim. App. Oct. 18, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018)). Accordingly, the trial court did not abuse its discretion in concluding the firearm was relevant.

The Defendant next asserts that even if the firearm was relevant, it was nevertheless unfairly prejudicial and subject to exclusion pursuant to Rule 404(b). The Defendant argues that the State's "primary purpose" in introducing the firearm was to prove the Defendant's "propensity for violence." As the State notes, the Defendant does not challenge on appeal the trial court's compliance with Rule 404(b)'s procedural requirements, so any challenge thereto is waived. Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Nevertheless, we conclude from our review of the record that the trial court substantially complied with Rule 404(b)'s procedural requirements and will review its evidentiary decision for an abuse of discretion. *DuBose*, 953 S.W.2d at 652.

The proof was clear and convincing that the Defendant was in possession of the firearm when he was arrested. However, the Defendant argues generally that the firearm was inadmissible propensity evidence which the State introduced to "elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror" from the jury.[5] As outlined above,

---

[5] We note that at oral arguments, the Defendant asserted that the admission of the firearm was unfairly prejudicial because it invited the jury to speculate as to why the Defendant was arrested nearly one year after the commission of the offenses giving rise to his charges in this case. He reiterated that he was arrested on September 3, 2022, for unrelated charges involving a different victim in a case which garnered national media attention. Because the Defendant presented these claims for the first time on appeal at oral arguments, they are waived for appellate review. *State v. Henry*, 539 S.W.3d 223, 250-51 (Tenn. Crim. App. 2017); *see also State v. McMillan*, No. E2020-00610-CCA-R3-CD, 2022 WL 855262, at *11 (Tenn.

- 16 -

each of the Defendant's charges required as an essential element proof of his possession of either a firearm, weapon, deadly weapon, or an article reasonably believed to be a weapon or deadly weapon. *See* footnote 4. Thus, whether he possessed a firearm during these offenses was a material issue. As the trial court noted, although the State did not necessarily have to introduce the firearm recovered from the Defendant's vehicle in order to prove the essential elements of its case, it was nevertheless relevant to help corroborate the victim's testimony and to show the Defendant had access to a firearm which tended to match the victim's description of the firearm used against her during the offenses. Additionally, as the Tennessee Supreme Court has noted, the possession of a firearm, "standing alone, does not constitute a crime," and in that respect, the fact that a defendant possessed a firearm is not generally inherently prejudicial. *See State v. Reid*, 213 S.W.3d 792, 813-14 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136, 150-51 (Tenn. 2021); *see also Jones*, 2024 WL 4442058, at *10 ("[P]ossession of a firearm generally standing alone is not overly prejudicial."). While the potential for prejudice in introducing such proof may be heightened in cases involving status offenses which make it a crime to possess a firearm, as here, those cases also require the State to present that proof, rendering the fact of a defendant's possession of a firearm highly probative. Accordingly, the probative value of the firearm was not outweighed by the danger of unfair prejudice in this case, and the trial court did not abuse its discretion by admitting it. The Defendant is not entitled to relief on this issue.

## B. *FERGUSON* CLAIM

The Defendant next argues that the trial court erred by denying his request to instruct the jury regarding lost or destroyed evidence pursuant to *State v. Ferguson*. He asserts that such an instruction was warranted because Sergeant Love conceded on cross-examination that she did not preserve the messages she reviewed between the victim and the Defendant contained on the victim's cell phone. The Defendant contends that these messages could have contained exculpatory evidence that supported his defense. The State responds that the trial court appropriately declined to issue a *Ferguson* instruction because the State had no duty to preserve the messages between the victim and the Defendant. We agree with the State.

Both the United States Constitution and the Tennessee Constitution guarantee the criminally accused the right to a fair trial. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8; *see also Daugherty v. State*, 393 S.W.2d 739, 743 (Tenn. 1965). "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." *Ferguson*,

---

Crim. App. Mar. 23, 2022) ("An issue is waived where it is raised for the first time at oral argument."), *no perm. app. filed*.

2 S.W.3d at 915 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Additionally, the right to a fair trial imposes upon the prosecution "a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt." *Ferguson*, 2 S.W.3d at 915 (citing *United States v. Agurs*, 427 U.S. 97 (1976)). The State's "loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013).

To determine whether a defendant's right to a fair trial has been infringed by the loss or destruction of evidence, a trial court must first determine whether the State had a duty to preserve the lost or destroyed evidence. *Id*. at 785. The State has a duty to preserve constitutionally material evidence "that might be expected to play a significant role in the suspect's defense." *Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). This evidence must both "potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 915, 918).

If a trial court determines the evidence is constitutionally material, it must then determine whether the State failed in its duty to preserve that evidence. *Merriman*, 740 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If so, then the trial court must determine the consequences of the State's failure to preserve evidence by considering

> (1) the degree of negligence involved in the destruction or loss of the evidence; (2) the significance of the destroyed evidence, considered in light of its probative value and the reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction.

*Rimmer*, 623 S.W.3d at 257 (first citing *Ferguson*, 2 S.W.3d at 917; and then citing *Merriman*, 410 S.W.3d at 785). If, upon review of these factors, the trial court determines the trial would be fundamentally unfair without the evidence, it must then decide the appropriate remedy, which "may include dismissal of the charges or a jury instruction explaining how the jury is to consider the lost or destroyed evidence." *Rimmer*, 623 S.W.3d at 257 (citing *Ferguson*, 2 S.W.3d at 917).

During the jury charge conference at the close of proof, the Defendant requested that the trial court include an instruction regarding lost or destroyed evidence pursuant to *State v. Ferguson* in the final jury instructions. The Defendant asserted that Sergeant Love had conceded that she reviewed messages on the victim's cell phone between the victim and the Defendant discussing an exchange of money for sex and neglected to "preserve" or "memorialize" them before returning the cell phone to the victim. The Defendant

- 18 -

asserted that the messages were thus "in the custody of the State of Tennessee and now [were] lost or destroyed," so a *Ferguson* instruction was appropriate. The State responded that the victim and Sergeant Love had both described the nature of the text messages during their testimonies. The State further argued that even if the messages "spell[ed] out a contract of money for sex," as the Defendant asserted, such evidence was not exculpatory because the evidence adduced at trial had demonstrated that the victim did not consent to having sex with the Defendant on September 21, 2021. The Defendant maintained that the messages could nevertheless have served to bolster his theory of the case that the victim met the Defendant to exchange sex for money and fabricated her allegations of rape when the Defendant failed to pay her sufficiently.

Following arguments, the trial court denied the Defendant's request to instruct the jury regarding lost or destroyed evidence. The trial court reasoned that the allegedly exculpatory evidence was "never in the possession of the State of Tennessee" because the victim only briefly allowed Sergeant Love to review the messages and then asked that Sergeant Love return her phone to her, a request which Sergeant Love honored; thus, the victim maintained possession of her cell phone. The trial court further found that even if the State had possessed the evidence, there was "absolutely nothing of any exculpatory value" on the victim's cell phone, reasoning that both the victim and Sergeant Love had testified that the victim discussed the Defendant's paying her for sex and that the victim sent sexually suggestive messages to the Defendant. The trial court concluded that the Defendant's presentation of his theory of the case had not been restricted by the absence of the evidence. We find the trial court's reasoning sound.

The Defendant maintains that the messages contained on the victim's cell phone were vital to his defense because they could have shown that the victim told the Defendant that "she was going to claim she was raped since [the Defendant] did not pay her." We need not linger on this issue for long. As noted above, the State's duty to preserve evidence is limited to constitutionally material evidence, which must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Merriman*, 410 S.W.3d at 785. The evidence at issue here consists of certain text messages and messages sent via Plenty of Fish between the victim and the Defendant. The Defendant asserts that the State had a duty to preserve evidence that included messages he sent to the victim; however, the Defendant presents no explanation as to why he was unable to procure comparable evidence by other reasonably available means, and the record remains silent on this issue. "When exculpatory evidence is equally available to the prosecution and the accused, the accused must bear the responsibility of [his] failure to seek its discovery." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (alteration in original) (citing *United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985), *cert. denied*, 474 U.S. 1086 (1986)). The nature of the challenged evidence is such that it would be equally available to the Defendant as to the State, if not more so, given the

victim's refusal to surrender her cell phone into evidence. But in the absence of any proof whatsoever regarding the Defendant's inability to procure this evidence, we cannot assign fault to the State on this issue. *See, e.g.*, *State v. Burkes*, No. E2017-00079-CCA-R3-CD, 2018 WL 2194013, at *7 (Tenn. Crim. App. May 14, 2018) ("[T]he defendant is not entitled to relief because the challenged evidence was not within the exclusive control of the prosecution and was instead equally available to both the defendant and the State through the use of compulsory process."), *no perm. app. filed*; *Dunkley v. State*, No. M2016-00961-CCA-R3-PC, 2017 WL 2859008, at *9 (Tenn. Crim. App. July 5, 2017) ("While the information on the telephone may have been material, it was substantially preserved during the data extraction, and the [p]etitioner acknowledged that the text messages would have been present on his own telephone had he not actively deleted them."), *perm. app. denied* (Tenn. Nov. 16, 2017); *State v. Freeman*, No. E2014-02054-CCA-R3-CD, 2016 WL 912160, at *14 (Tenn. Crim. App. Mar. 10, 2016) ("[T]he [d]efendant acknowledges that the desired information would have been available to him had he been able to locate his own cell phone. We find it dubious that the [d]efendant should fault the State for failing to preserve evidence which he himself also failed to safeguard."), *no perm. app. filed*. The Defendant is not entitled to relief on this claim.

## C. BIFURCATION

The Defendant also argues the trial court erred by denying his motion to bifurcate his charge of unlawful possession of a firearm by a convicted felon. Although he concedes he agreed to stipulate to his prior conviction of a violent felony, he nevertheless asserts that the effect of trying "all counts simultaneously was to show the jury that [the Defendant] had a violent character [and] acted in accordance with that violent character," which ultimately lent the prosecution "an unfair advantage at trial." The State responds that the trial court did not abuse its discretion by denying the Defendant's motion to bifurcate. We agree with the State.

A trial court's decision not to bifurcate certain counts of a defendant's indictment from the others at trial necessarily concerns the admissibility of evidence. Consequently, as with other trial court rulings on the admissibility of evidence, we review this determination for an abuse of discretion. *See State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002) (citing *Dubose*, 953 S.W.2d at 652). "Bifurcation concerns splitting a charge into two separate determinations involving guilt and punishment by the same jury." *State v. Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *15 n.12 (Tenn. Crim. App. Feb. 9, 2018), *no perm. app. filed*. While sometimes referred to by this court as the better practice, "no procedure has been prescribed by [the appellate courts] for bifurcation proceedings in contexts involving a charge of possessing a firearm as a convicted felon." *State v. Johnson*, No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *13 (Tenn. Crim. App. Nov. 14, 2019), *perm. app. denied* (Tenn. Apr. 1, 2020). We have repeatedly

reaffirmed that bifurcation is not mandatory. *See, e.g.*, *State v. Howard*, No. W2020-00207-CCA-R3-CD, 2021 WL 144235, at *4 (Tenn. Crim. App. Jan. 15, 2021), *perm. app. denied* (Tenn. May 14, 2021); *State v. Buchanan*, No. M2017-02268-CCA-R3-CD, 2019 WL 852192, at *2 (Tenn. Crim. App. Feb. 21, 2019), *perm. app. denied* (Tenn. Apr. 11, 2019); *Richardson*, 2018 WL 821775, at *16. Furthermore, in prosecutions for charges of unlawful possession of a firearm by a convicted felon, disclosure of a defendant's prior felonies is "relevant to establish an essential element of the crime for which the defendant is being tried." *Foust*, 482 S.W.3d at 47 (citing *James*, 81 S.W.3d at 760-61). As relevant here, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon[.]" Tenn. Code Ann. § 39-17-1307(b)(1)(A).

On the first day of trial, but before *voir dire*, the Defendant orally moved to bifurcate his charge of unlawful possession of a firearm by a convicted felon. He argued it would prejudice his defense if the jury were presented with proof of the Defendant's prior conviction of a violent felony when considering his charges of especially aggravated kidnapping and aggravated rape. The State opposed the Defendant's motion.

Following arguments, the trial court denied the Defendant's motion to bifurcate. The trial court reasoned that because the Defendant had been charged with unlawful possession of a firearm by a convicted felon, a charge which included as an essential element proof of the Defendant's previously having been convicted of a prior violent felony, introducing such proof would not be unfairly prejudicial. Relying upon *State v. Reid*, 213 S.W.3d at 813-14, the trial court further noted that because possession of a firearm is not a crime, bifurcation would effectively first ask the jury to adjudicate the Defendant's guilt for "something that is not a crime." After a recess, the Defendant agreed to stipulate to his having been previously convicted of a prior violent felony. The trial court accepted this stipulation and stated it would issue a limiting instruction to the jury when the stipulation was read.

As the Defendant concedes, "stipulating to prior felonies and requesting bifurcated proceedings are both valid avenues for a defendant charged with possession of a firearm as a convicted felon." *Johnson*, 2019 WL 6045569, at *14 (citing *State v. Smith*, No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013), *perm. app. denied* (Tenn. Jan. 15, 2014)). The Defendant nevertheless asserts that because this court and the Tennessee Supreme Court have acknowledged that bifurcation is the better procedure, the trial court abused its discretion by denying his request to be afforded the better procedure. We will reverse a trial court's ruling on a motion to bifurcate only for an abuse of discretion; that is, only "when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice

to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). Here, the trial court did neither.

The trial court permitted the Defendant to stipulate to his having previously been convicted of a violent felony without disclosing the name or nature of the prior conviction, a method of limiting the potential prejudicial effects of prosecutions involving status offenses which this court has repeatedly approved. *See, e.g.*, *State v. Green*, No. W2022-01514-CCA-R3-CD, 2024 WL 472663, at *8-9 (Tenn. Crim. App. Feb. 7, 2024), *perm. app. denied* (Tenn. June 21, 2024); *Howard*, 2021 WL 144235, at *4. Additionally, the record reflects that the trial court instructed the jury both after the stipulation regarding the Defendant's prior conviction of a violent felony was read to the jury and in its final jury instructions to "consider any prior felony convictions as an element of the offense of being a convicted felon in possession of a firearm and for no other purpose." The jury is presumed to follow the court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006) (citing *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001)). Accordingly, the trial court did not abuse its discretion in denying the Defendant's motion to bifurcate. The Defendant is not entitled to relief on this issue.

## D. SUFFICIENCY OF THE EVIDENCE

Finally, the Defendant argues the evidence was insufficient to sustain his convictions of aggravated rape, aggravated kidnapping, and unlawful possession of a firearm by a convicted felon. In support of this argument, the Defendant generally asserts that the victim was not a credible witness and that no reasonable juror could have believed her testimony. The State responds that the evidence was sufficient to sustain the Defendant's convictions. We agree with the State.

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted) (emphasis in original); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the

State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence . . . because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

As relevant here, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant" where "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon[.]" Tenn. Code Ann. § 39-13-502(a)(1). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required[.]" Tenn. Code Ann § 39-13-501(7). As charged in this case, "[a]ggravated kidnapping is false imprisonment" committed "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). Finally, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence." Tenn. Code Ann. § 39-17-1307(b)(1)(A).

As a preliminary matter, we note that the Defendant asserts in his brief that "[i]n order to support all of the essential elements of aggravated kidnapping," the State must have established beyond a reasonable doubt that the Defendant confined the victim in a manner that substantially interfered with her liberty" and that "the victim was injured or [the Defendant] confined the victim in order to facilitate the commission of her rape." The indictment in this case charged the Defendant with especially aggravated kidnapping pursuant to Code section 39-13-305(a)(1), which requires proof of false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." The jury was charged to consider aggravated kidnapping as the lesser-included offense of especially aggravated kidnapping pursuant to Code section 39-13-304(a)(5), which requires proof of false imprisonment committed "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." The jury ultimately convicted the Defendant of aggravated kidnapping as the lesser-included offense of especially aggravated kidnapping pursuant to Code section 39-13-304(a)(5), not section 39-13-304(a)(1). Although the

- 23 -

Defendant has neglected to present any specific challenge to the sufficiency of the evidence as it relates to his aggravated kidnapping conviction beyond a general challenge to the victim's credibility, we nevertheless note that his reliance upon Code section 39-13-304(a)(1) is misplaced.

The Defendant asserts a number of reasons why, in his view, no reasonable juror could have accredited the victim's testimony: he argues that the victim "did not tell [the Defendant] the amount of money" he needed to pay her in exchange for sex but conceded at trial "she hoped to earn $200"; she "did not call 911 in the immediate aftermath of the acts" and instead "called a friend she had met online to tell her what had happened"; and she "concealed important information when she spoke with [Sergeant] Love." Each of these theories was presented to the jury throughout the Defendant's trial, including during his cross-examination of the victim, Officer Hardville, and Sergeant Love, as well as during his opening statement and closing argument, and the jury, upon consideration thereof, nevertheless accredited the victim's testimony, as evidenced by its verdict. It is not the province of this court to reweigh the evidence or to substitute our credibility determinations for those of the jury. *Curry*, 705 S.W.3d at 183. The Defendant's argument is unavailing.

The evidence, when viewed in the light most favorable to the State, is sufficient to sustain each of the Defendant's convictions. The evidence adduced at trial established that the victim and the Defendant initially became acquainted via Plenty of Fish and arranged to meet in person on September 21, 2021. The Defendant provided an address to the victim, who then met the Defendant there. When the victim arrived, she saw the Defendant standing in the doorway of an apartment unit. The victim approached the Defendant, and the Defendant placed a shirt over her head and told her not to move. The Defendant withdrew his firearm and held the victim at gunpoint as he directed her through the apartment unit and into a white Dodge Charger parked outside, where he inserted his penis into the victim's vagina without her consent. This proof is sufficient to sustain the Defendant's convictions of aggravated rape and aggravated kidnapping. Furthermore, the parties stipulated at trial that the Defendant had previously been convicted of a violent felony, and the victim testified that the Defendant used a firearm during the perpetration of her rape and kidnapping. This proof is also sufficient to sustain the Defendant's conviction of unlawful possession of a firearm by a convicted felon. The Defendant is not entitled to relief on this issue.

### III.    CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgments of the trial court.


s/ *Steven W. Sword*
STEVEN W. SWORD, JUDGE